UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

━━━━━━━━━━━━━━━━

№ 11-CV-1275 (JFB)(ARL)

━━━━━━━━━━━━━━━━

PATRICK J. O'CONNOR,

Plaintiff,

VERSUS

HUNTINGTON U.F.S.D., JOSEPH LEAVY, JOHN AMATO,

Defendants.

━━━━━━━━━━━━━━━━

**MEMORANDUM AND ORDER**
March 25, 2014

━━━━━━━━━━━━━━━━

JOSEPH F. BIANCO, District Judge:

Patrick J. O'Connor ("O'Connor" or "plaintiff") brings this action against his former employer, the Huntington Union Free School District ("the District"), Joseph Leavy ("Leavy"), and John Amato ("Amato") (collectively, "defendants") for retaliation in violation of his First Amendment rights pursuant to 42 U.S.C. § 1983; and for discrimination based on his perceived disability pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York State Human Rights Law ("HRL"), N.Y. Exec. Law § 296. Plaintiff alleges that the District constructively discharged him from his tenured teaching position after he (1) complained about cheating during the grading of statewide exams; and (2) informed supervisors that he suffered from anxiety and depression. Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the motion as to the federal claims, and declines to exercise supplemental jurisdiction over the remaining state claim.

I. BACKGROUND

A. Factual Background

The Court takes the following facts from the parties' affidavits, depositions, exhibits, and Rule 56.1 Statements of Fact. The Court construes the facts in the light most favorable to O'Connor, the nonmoving party.[1] *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005).

Plaintiff began working for the District in September 1998 and received tenure in

---

[1] Although the parties' Rule 56.1 statements contain specific citations to the record, the Court cites to the statements rather than to the underlying citations. Unless otherwise noted, where a party's Rule 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any contradictory evidence in the record.

2001. (Def. 56.1 ¶¶ 1–2.) He taught social studies to seventh and eighth graders at Finley Middle School. (*Id.* ¶ 7.) Despite being scheduled to teach during the 2008–2009 academic year, O'Connor resigned on August 22, 2008. (*Id.* ¶¶ 3, 8.)

1. Plaintiff's Statements to His Supervisors

a. Alleged Improprieties during the Grading of a Statewide Examination

In June 2006, plaintiff and seven other Finley teachers graded the statewide eighth grade social studies examination under the unofficial oversight of Mike McCabe. (*Id.* ¶¶ 90, 92.) Teachers could not grade their own students, and they graded the essays by a "round robin" whereby one teacher would grade an essay and then pass it to another. (*Id.* ¶¶ 93–94.) Before grading began, Denise Dechiaro told plaintiff that they would give the students only fours or fives (out of five) on the essays. (*Id.* ¶ 91.) In fact, while Rick Erickson was grading one of Dechiaro's students, Dechiaro asked Erickson why he was giving the student only a three or four. (*Id.* ¶ 97.) Erickson told Dechiaro to not interrupt. (*Id.* ¶¶ 98–99.) Plaintiff also told McCabe, "You need to do something. You need to stop Denise from doing this." (Pl. 56.1 ¶ 101.) McCabe instructed Dechiaro "to stop interrupting graders while they were grading the exam and asking for their scores, thus violating exam confidentiality." (Def. 56.1 ¶ 103.)

That fall, plaintiff began to question the grades' accuracy because he thought the scores were high for Finley given its demographics. (*Id.* ¶ 104.) He believed that Dechiaro compromised the grading of the essay sections by questioning the scorers, although O'Connor never asked McCabe or Erickson if they raised any grades because of Dechiaro's interruptions. (*Id.* ¶¶ 105, 107.) Plaintiff, however, knew of no other teacher who may have misgraded exams. (*Id.* ¶ 108.) Nevertheless, he reported what occurred to Amato (the Principal) and Leavy (the Director of Humanities), who agreed to investigate. (*Id.* ¶¶ 109–113) According to O'Connor, Leavy also said, "Patrick, you are aware that you're going to destroy any relationship that you have with your colleagues, and that you are to prepare for the roller coaster ride of your career." (Leavy Dep., Def. Ex. D, at 95:11–15.) Leavy notified Mike O'Brien, the Assistant Superintendent of Curriculum, of the allegations. (Def. 56.1 ¶ 114.) After investigating and reviewing essays and corresponding grades, Leavy found no evidence of grade inflation. (*Id.* ¶ 116.)

b. Anxiety and Depression

Plaintiff began experiencing anxiety attacks in 2003 (*Id.* ¶ 126), and his doctor, James Wheeler, diagnosed him with dysthymia in 2004 (*id.* ¶ 127.) Plaintiff and his physician never gave the District notes regarding the condition. (*Id.* ¶¶ 128–29.) Plaintiff first told Amato and Leavy he was depressed and anxious in Fall 2006. (*Id.* ¶¶ 130, 135.) He said his symptoms stemmed from mistreatment by three other teachers.[2] (*Id.* ¶¶ 131, 136.) During the 2007–2008 academic year, O'Connor told Amato and Leavy he was seeing a counselor. (*Id.* ¶¶ 132, 138.) Amato testified that plaintiff never said he suffered from clinical depression or anxiety. (*Id.* ¶ 133.) Plaintiff never requested an accommodation for his condition. (*See id.* ¶ 139.)

---

[2] Plaintiff considers this fact immaterial because his relationship with his mother actually caused his condition. (*See* Pl. 56.1 ¶ 131.) The District, however, only knew about his issues with other faculty members. (Def. 56.1 ¶ 131.)

2

2. Plaintiff's Performance Reviews and Improvement Projects

Teachers at Finley receive Annual Professional Performance Reviews ("APPRs"). (*Id.* ¶ 12.) Plaintiff's APPRs from 2001 through 2005 were positive, although they recommended improvement in management of student behavior (2002 APPR, Gould Aff. Ex. 5), student development and assessment (2003 APPR, Gould Aff. Ex. 6), and preparation of appropriate materials and awareness of state educational standards (2005 APPR, Gould Aff. Ex. 8). The 2005 APPR was the last evaluation by Leavy's predecessor, Debra Haskins. She encouraged plaintiff to develop skills for statewide assessments and preparing lesson materials. (*Id.* at 2.)

Leavy became the Director of Humanities on July 1, 2005. (Def. 56.1 ¶ 16.) He reviewed plaintiff's file early on because plaintiff had a less than effective evaluation in previous APPRs. (*Id.* ¶¶ 18–19.) In 2006, Leavy rated plaintiff as effective in his knowledge of the content area and instructional delivery, but took issue with plaintiff's preparation of classroom materials, understanding of state standards, and classroom management. (2006 APPR, Gould Aff. Ex. 9.) Leavy encouraged adjustments to lesson planning and preparation of materials to ensure adherence to the statewide curriculum for seventh graders. (*Id.* at 2.) Nonetheless, he characterized the 2006 APPR as "generally effective." (Pl. 56.1 ¶ 26.)

John Amato became principal of Finley on July 1, 2006. (Def 56.1 ¶ 28) Plaintiff's 2007 APPR was based on two formal observations and several shorter informal observations by Leavy and Amato. (*Id.* ¶ 29.) Leavy observed plaintiff on March 27, 2007. (March 2007 Observation Report, Gould Aff. Ex. 10.) Leavy noted plaintiff's command of the content and thought the preparation of the lesson was fair, but was concerned about plaintiff's classroom control, time management, and simplistic pedagogical practices. (*Id.*) Amato gave a more positive assessment in December 2006. (*See* December 2006 Observation Report, Gould Aff. Ex. 11.)

The 2007 APPR was more negative than previous ones. Leavy and Amato took issue with plaintiff's preparation, instructional delivery, classroom management, and student assessment. (2007 APPR, Gould Aff. Ex. 12.) Consequently, Leavy instituted a Plan for Accountability and Monitoring ("PAM"). The PAM required plaintiff to submit detailed lesson plans and curriculum maps to ensure effective instruction in the classroom; provided for three unannounced observations per month; required submission of the grade book to supervisors to show a link between assessments and instructions; required plaintiff to visit colleagues' classrooms; and provided for conferencing at any time to ensure adjustments for improvement. (PAM, Gould Aff. Ex. 2.) The PAM led to twenty-six observations of plaintiff during the 2007–2008 academic year. (Def. 56.1 ¶ 57.) Leavy observed O'Connor at least seven times, and most of the evaluations were critical of plaintiff's performance. (*See* 2007–2008 Leavy Classroom Observations, Gould Aff. Exs. 14–17, 20, 22.) Amato formally observed plaintiff three times and found the lessons to be generally satisfactory. (*See* 2007–2008 Amato Classroom Observations, Gould Aff. Exs. 18, 19, 21.)

Plaintiff's 2008 APPR also was negative. Leavy and Amato took issue with plaintiff's knowledge of the content area, preparation, instructional delivery, classroom management, student assessment,

and reflective and responsive practice. (2008 APPR, Gould Aff. Ex. 25.) They noted plaintiff's failure to adhere to the PAM and to proactively improve his performance. (*See id.* at 2–3.) Thus, Leavy proposed a Teacher Improvement Plan ("TIP"). The TIP, which never went into effect because plaintiff resigned, provided for, *inter alia*, weekly submission of detailed lesson plans to ensure effective classroom instruction and teaching targets; weekly professional periods; submission of major classroom assignments to ensure a link between the lesson and assessments; grade book reviews; weekly unannounced classroom observations; and effective classroom management. (TIP, Gould Aff. Ex. 3.)

### 3. Complaints about Leavy and Plaintiff's Resignation

Plaintiff made efforts to address his relationship with Leavy, the deterioration of which plaintiff attributed to "[n]umerous unannounced observations, pedantic and punitive criticism, lack of constructive support, micromanagement of instruction." (Def. 56.1 ¶ 185.) For instance, plaintiff met with Assistant Superintendent Joseph Giani several times to complain about the treatment from Leavy. (*E.g.*, *id.* ¶ 192.) For instance, Plaintiff said he felt he was being harassed and wanted Leavy removed as his supervisor. (*Id.* ¶¶ 193–94.) Giani told plaintiff to follow the recommended program and assured him that he was not in danger of being fired. (*Id.* ¶ 195.) Giani also told Leavy to be supportive of plaintiff and to give suggestions for improvement. (*Id.* ¶ 197.) After additional complaints in March 2008, Giani again told plaintiff to relax. (*Id.* ¶¶ 201, 203.) Giani said plaintiff was capable of meeting expectations. (*Id.* ¶ 204.)

Nonetheless, after the preparation of the TIP and shortly before the 2008–2009 academic year, plaintiff's psychologist advised plaintiff that continuing to work at the District would be detrimental to his health. (Pl. 56.1 ¶ 3.) Dr. Wheeler recommended that plaintiff resign to avoid the stress of constant observations. (*Id.* ¶¶ 3, 271.) Plaintiff tendered his resignation on August 22, 2008. (Def. 56.1 ¶ 3.)

### B. Procedural History

Plaintiff filed the complaint on March 16, 2011. Defendants answered on April 15, 2011. On May 21, 2012, defendants moved to amend their answer to add a res judicata defense and, upon such amendment, for summary judgment. On July 24, 2012, for reasons set forth orally on the record, the Court denied the motion to amend because of the prejudice to plaintiff due to the defendants' delay in seeking the amendment, as well as on grounds of futility. Defendants filed the instant motion on July 8, 2013. Plaintiff opposed on September 13, 2013, and defendants replied on October 4, 2013. The Court held oral argument on October 22, 2013.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits

4

or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249–50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247–48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

### III. DISCUSSION

Plaintiff alleges that the District (1) retaliated against him for reporting the potential grading irregularities, in violation of his First Amendment rights; and (2) discriminated against him on the basis of perceived disability, in violation of the ADA and HRL. As discussed below, the Court concludes that summary judgment is warranted in defendant's favor on the federal claims because, even construing the facts most favorably to plaintiff, plaintiff cannot establish a prima facie case for either cause of action. In particular, as to the First Amendment retaliation claim, it is clear based upon the uncontroverted evidence in the record that plaintiff's speech was as a public employee, rather than as a private citizen. In any event, no rational jury could conclude that plaintiff suffered a constructive discharge under the facts of this case. Finally, as to the ADA claim, there is no evidence in the record from which a rational jury could conclude that defendant regarded plaintiff as disabled because he was being treated for depression.

A.   First Amendment Retaliation Claim

O'Connor brings his First Amendment retaliation claim pursuant to 42 U.S.C. § 1983, which is "a method for vindicating federal rights elsewhere conferred by those

5

parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979). To succeed on a § 1983 claim, a plaintiff must prove "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of the United States." *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted).

To succeed on a First Amendment retaliation claim, a public employee first must establish a prima facie case by showing: "(1) [he] engaged in constitutionally protected speech because [he] spoke as [a] citizen[] on a matter of public concern; (2) [he] suffered an adverse employment action; and (3) the speech was a 'motivating factor' in the adverse employment decision." *Skehan v. Vill. of Mamaroneck*, 465 F.3d 96, 106 (2d Cir. 2006), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138, 140 (2d Cir. 2008). Defendants, however, may still "escape liability if they can demonstrate that either (1) the defendant would have taken the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2) the plaintiff's expression was likely to disrupt the government's activities and that the harm caused by the disruption outweighs the value of the plaintiff's expression." *Id.* The latter is known as the "*Pickering* balancing test" and is a question of law. *See Cobb v. Pozzi*, 363 F.3d 89, 102 (2d Cir. 2004) (referring to *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1986)). Even if the defendant prevails on the *Pickering* test, the plaintiff may succeed by showing that the adverse action was in fact motivated by retaliation and not by any fear of a resultant disruption. *See Reuland v. Hynes*, 460 F.3d 409, 415 (2d Cir. 2006).

Defendants argue that there is no genuine issue of material fact as to whether their conduct deprived O'Connor of his First Amendment rights, because (1) plaintiff spoke as an employee and (2) the increased performance scrutiny does not constitute an adverse employment action as a matter of law. Plaintiff counters that he spoke as a citizen on a matter of public concern and focuses on his constructive discharge. As set forth below, after viewing the facts and drawing all inferences in the light most favorable to O'Connor, the Court concludes that plaintiff has not established a prima facie First Amendment retaliation claim as a matter of law. First, his speech is not protected because he spoke as a public employee, not as a citizen. Second, in the alternative, no reasonable factfinder could conclude that the increased performance scrutiny is an adverse employment action. Accordingly, the Court grants summary judgment to defendants on the First Amendment retaliation claim.

1. Speech as an Employee or a Citizen

    a. Legal Standard

A plaintiff alleging retaliation must establish speech protected by the First Amendment. *Sousa v. Roque*, 578 F.3d 164, 169–70 (2d Cir. 2009) (quoting *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008)). The threshold inquiry is "whether the employee spoke as a citizen on a matter of public concern." *Id.* at 170 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). This test contains two separate requirements, both of which must be met: (1) the employee must speak as a citizen, rather than as a public employee; and (2) the employee must speak on a matter of public concern. *Id.* ("If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public

concern, 'the employee has no First Amendment cause of action based on his or her employer's reaction to the speech.'" (quoting *Garcetti*, 547 U.S. at 418)).[3] In discussing this inquiry, the *Garcetti* court explained that

> [r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

547 U.S. at 421–22.

By expressly holding that speech pursuant to a public employee's official duties is not insulated from employer discipline, *Garcetti* thus directs a court's attention to the role the speaker occupied. *Kelly v. Huntington Union Free Sch. Dist.*, No. 09-CV-2101 (JFB)(ETB), 2012 WL 1077677, at *11 (E.D.N.Y. Mar. 30, 2012) (citations omitted). Although the Supreme Court did not set forth specific criteria for determining when speech is made pursuant to an employee's official duties, it instructed that the inquiry "is a practical one[,]" because "the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25. The Court also noted that speech by a public employee retains some possibility of First Amendment protection when it "is the kind of activity engaged in by citizens who do not work for the government." *Id.* at 423; *see Jackler v. Byrne*, 658 F.3d 225, 238 (2d Cir. 2011).

Since *Garcetti*, lower courts have developed more guidelines for determining whether speech is made pursuant to a public employee's official duties. Courts may consider the following factors, none of which are dispositive: the plaintiff's job description; the persons to whom the speech was directed; and whether the speech resulted from special knowledge gained through the plaintiff's employment. *See Caraccilo v. Vill. of Seneca Falls*, 582 F. Supp. 2d 390, 405 (W.D.N.Y. 2008). As indicated by *Garcetti*, two relevant factors that, considered in isolation, are not dispositive are whether the speech occurred in the workplace and whether the speech concerned the subject matter of the employee's job. *See* 547 U.S. at 420–21; *accord Abdur-Rahman v. Walker*, 567 F.3d 1278, 1282 (11th Cir. 2009).

b. Analysis

Defendants argue that O'Connor's complaints of grading impropriety are not constitutionally protected because (1) the speech owes its existence to his professional duties; (2) he never conveyed his complaints

---
[3] In *Sousa*, the Second Circuit reiterated that "a speaker's motive is not dispositive in determining whether his or her speech addresses a matter of public concern." 578 F.3d at 173. Thus, the court held that "the District Court erred in concluding that Sousa's speech did not address a matter of public concern because he was motivated by his employment grievances." *Id.* at 174. Instead, "[w]hether or not speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record, and while motive surely may be one factor in making this determination, it is not, standing alone, dispositive or conclusive." *Id.* at 175 (internal quotation marks and citations omitted). As noted above, however, this Court need not address the "matter of public concern" requirement because the undisputed facts demonstrate as a matter of law that plaintiff spoke as an employee pursuant to his official duties, not as a citizen.

7

to the public and only approached the New York State Board of Education after his resignation; and (3) the speech resulted from the special knowledge he acquired while acting in his professional capacity. Plaintiff counters that (1) the Second Circuit has not ruled that a teacher's allegations of suspected cheating do not constitute protected speech; (2) the fact that he expressed his view at work is not dispositive; (3) defendants have not shown that reporting potential cheating was within the province of plaintiff's professional duties; and (4) the complaints had nothing to do with his students, job performance, or working conditions, and he had no responsibility to oversee the grading. Given the underlying uncontroverted facts, the Court holds that, under *Garcetti*, plaintiff spoke in his capacity as a teacher, not as a citizen. Consequently, the First Amendment does not protect his speech.[4]

First, O'Connor complained to his supervisors about the grading irregularities pursuant to his professional responsibilities and duties as a schoolteacher and grader. It is irrelevant that defendants point to no official policy requiring teachers to report grading irregularities or that the complaints did not concern his own students, classrooms, curricula, or safety. The Second Circuit is clear that "under the First Amendment, speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description." *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 202 (2d Cir. 2010) [hereinafter *Weintraub II*]; *accord Nagle v. Marron*, 663 F.3d 100, 106–07 (2d Cir. 2011). Speech especially is "pursuant to" an employee's official duties when it is "part-and-parcel" of the employee's concerns about his ability to "properly execute his duties," or when the speech is a "means to fulfill" and "undertaken in the course of performing . . . his primary employment responsibility." *Weintraub II*, 593 F.3d at 203; *see Portelos v. City of New York*, No. 12-CV-3141(RRM)(VMS), 2013 WL 789460, at *1 (E.D.N.Y. Mar. 1, 2013) (detailing *Weintraub II* standard). In the instant case, as discussed below, it is uncontroverted that O'Connor spoke internally about suspected cheating on a particular statewide test that he was assigned to grade as part of his employment. Thus, even though it did not involve students that he taught on a regular basis, there is no question that reporting grading irregularities or any other cheating in that situation is part-and-parcel of his job duties as an assigned grader on that particular exam, as well as his general duties as a teacher. Ensuring the integrity of the taking and the grading of exams is a quintessential duty of a teacher. *See, e.g.*, *Adams v. N.Y. State Educ. Dep't*, No. 08 Civ. 5996 (VM)(AJP), 2010 WL 624020, at *24–25 (S.D.N.Y. Feb. 23, 2010) (holding that teachers' internal complaints about, *inter alia*, deplorable classroom

---

[4] Any uncertainty as to whether this issue is a question of law for the Court or a mixed question of law and fact in part for the factfinder does not impact the analysis herein. The Second Circuit notes that "[w]hether the employee spoke solely as an employee and not as a citizen is also largely a question of law for the court." *Jackler*, 658 F.3d at 237. Here, the issue of whether plaintiff spoke as a citizen or a public employee is a matter of law because no genuine disputes of material fact exist regarding the underlying content of O'Connor's speech or the other factors relevant to the question of whether he spoke as a citizen or an employee. O'Connor argues that defendants have not demonstrated that reporting potential cheating by a colleague during the grading of the exams "was particularly within the province of plaintiff's professional duties." (Opp., at 10.) As set forth *infra*, the Court disagrees. Given the uncontroverted facts and drawing all reasonable inferences in favor of plaintiff, no reasonable factfinder could conclude that plaintiff spoke outside the context of his professional duties.

8

conditions, unruly students, overcrowding, and schedules were unprotected because they concerned responsibilities that are "quintessentially those of a teacher").

The situation in this case is analogous to *Weintraub II*, where a teacher complained to his supervisor and filed a grievance regarding how a student was not properly disciplined after throwing a book at Weintraub during class. 593 F.3d at 199, 203. The Second Circuit held that Weintraub spoke as an employee, not as a citizen, and thus the speech was not protected under *Garcetti*. *Id.* at 203. The court reasoned that the grievance was "'part-and-parcel'" of Weintraub's concerns "about his ability to 'properly execute his duties' as a public school teacher—namely, to maintain classroom discipline." *Id.* (internal citation omitted). The court contrasted this with the situation in *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 411 (1979), where an English teacher was dismissed primarily because she internally aired her grievances regarding the placement of Black people working in the cafeteria, the integration of the administration staff, and the placement of Black Neighborhood Youth Corps workers in semi-clerical positions. In *Weintraub II*, the Second Circuit noted that the grievance in *Givhan* "was not in furtherance of the execution of one of [the teacher's] core duties as an English teacher," but rather "concerned the general impression that black[] students might take away from the staffing of non-teaching positions." 593 F.3d at 203.

In this case, as in *Weintraub*, no reasonable factfinder could find that the complaints were not "part-and-parcel" of his professional duties. *Id.* When he graded the exams, O'Connor taught social studies to seventh graders. (Def. 56.1 ¶ 7.) He graded the exams along with seven other Finley teachers under the supervision of McCabe, a social studies teacher. (*Id.* ¶¶ 90, 92.) Plaintiff does not claim that he was not required to grade the exams pursuant to his official duties or that persons not employed by the District graded the exams. Further, plaintiff approached Leavy and Amato with his concerns because he thought students' grades were implausible based on Finley's demographics. (*Id.* ¶ 104.) Unlike in *Givhan*, there is no evidence from which a reasonable juror could conclude that the complaints concerned something akin to the general impressions that students or the public might take away from the grading impropriety. The only reasonable inference a rational factfinder could make is that plaintiff's complaints were "part-and-parcel" of his official duties because there was a *de facto* burden on persons who participated in the grading to ensure the integrity of the grading process and to report potential grading irregularities to the appropriate superiors.

In such circumstances, "when a public employee airs a complaint or grievance, or expresses concern about misconduct, to his or her immediate supervisor *or* pursuant to a clear duty to report imposed by law or employer policy, he or she is speaking as an employee and not as a citizen." *Weintraub v. Bd. of Educ.*, 489 F. Supp. 2d 209, 219 (E.D.N.Y. 2007) [hereinafter *Weintraub I*] (emphasis added); *see also Battle v. Bd. of Regents*, 468 F.3d 755, 761 (11th Cir. 2006) (holding that retaliation claim failed because plaintiff admitted she had employment duty to ensure accuracy and completeness of student files and report mismanagement or fraud encountered therein); *Kelly*, 2012 WL 1077677, at *13–14 (complaints regarding safety at school field trip, improper tutoring, and giving out parents' addresses in order to support a Board candidate were pursuant to duties as a teacher); *Rodriguez v. Laredo*

9

*Independent Sch. Dist.*, 82 F. Supp. 2d 679, 686–87 (S.D. Tex. 2000) (finding that assistant superintendent's reporting of testing irregularities to supervisor and board and insistence that such practices be discontinued was unprotected speech, although it also implicated matters of public concern, because remarks were uttered in employee's professional capacity during dealings with other educational professionals, she admitted she was obligated to perform duties as part of responsibilities for curriculum and program accountability, and complaints only were aired internally).[5]

Further, as in *Kelly* and *Rodriguez*, the second factor—the person to whom the speech was directed—also weighs in defendants' favor. Plaintiff spoke to his supervisors and the District's administration. (Def. 56.1 ¶¶ 109–12, 114, 120, 122.) He never raised his concerns publicly, and he only informed the State Board of Education of the alleged cheating in September 2008, after he resigned. (*Id.* ¶ 124.) This factor thus supports the conclusion that O'Connor considered his complaints to Leavy and Amato to not be a public matter. *See Kelly*, 2012 WL 1077677, at *13 (reasoning that fact that plaintiff teacher directed speech at school administration and supervisors, rather than news media or third parties, weighed in favor of defendants); *Taylor v. N.Y.C. Dep't of Educ.*, No. 11-CV-3582, 2012 WL 3890599, at *3–4 (S.D.N.Y. Sept. 6, 2012) (noting that several courts hold that speech made through internal channels and without a relevant civilian analogue is not speech as a citizen and therefore is unprotected).

The third factor—whether the speech resulted from knowledge gained through plaintiff's employment—also weighs in defendants' favor. Plaintiff learned of the potential irregularities because he graded the exams, spoke to Dechiaro, saw Dechiaro interrupt Erikson and McCabe, and was aware of Finley's demographics. Therefore, plaintiff only could complain about potential improprieties based on information obtained during the course of his official duties as a public employee. If he were not a teacher, he (1) would not have spoken to Dechiaro; (2) would not have seen Dechiaro interrupt the grading; and (3) would have less cause to believe graders changed the scores because of such interruptions.

In sum, although no single factor is dispositive, the uncontroverted facts demonstrate that, under *Garcetti*, O'Connor spoke as a public employee, rather than as a private citizen, when he complained about potential grading improprieties. This determination is consistent with those by other courts that conclude that such internal complaints by teachers about their colleagues' professional misconduct based upon information learned through the teachers' positions constitute speech as a public employee that is not protected by the First Amendment. *See, e.g.*, *Kelly*, 2012 WL 1077677, at *12–15; *Weintraub I*, 409 F. Supp. 2d at 219; *Battle*, 468 F.3d at 761; *Rodriguez*, 82 F. Supp. 2d at 686–87. Accordingly, the Court grants summary judgment to defendants on the First

---

[5] Taking plaintiff's position—that the "pivotal" distinction "is whether the speech relates to the plaintiffs' own students, classrooms, curricula, safety, and employment" (Opp., at 10)—to its natural conclusion, a teacher would not be speaking as an employee if she reported that another teacher's students cheated or that another teacher abused her student. There is no support in the record for such a restrictive understanding of official duties. Moreover, at oral argument, plaintiff was unable to cite to any case that took such a narrow view of official duties in the context of a teacher, or any other analogous context.

10

Amendment retaliation claim under 42 U.S.C. § 1983.[6]

2. Adverse Employment Action

The Court next concludes, in the alternative, that defendants are entitled to summary judgment because, even construing the evidence most favorably to plaintiff, no rational jury could conclude that he was constructively discharged.

"In the context of a First Amendment retaliation claim, . . . only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech.*, 464 F.3d 217, 225 (2d Cir. 2006) (internal quotation omitted). Adverse employment actions include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Wrobel v. Cnty. of Erie*, 692 F.3d 22, 31 (2d Cir. 2012); *Morris v. Landau*, 196 F.3d 102, 110 (2d Cir. 1999). A constructive discharge is "functionally the same as an actual termination" and therefore is considered an adverse employment action. *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004); *see also Fitzgerald v. Henderson*, 251 F.3d 345, 357 (2d. Cir. 2001) (stating that discharge from employment "may be either an actual termination . . . or a 'constructive' discharge"). Further, "lesser actions" may be "considered adverse employment actions." *Morris*, 196 F.3d at 110; *see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) ("Our precedent allows a combination of seemingly minor incidents to form the basis of a constitutional retaliation claim once they reach a critical mass." (citing *Bernheim*, 79 F.3d at 325)).

"A constructive discharge occurs when an employer 'intentionally create[s] an intolerable work atmosphere that force[s the plaintiff] to quit involuntarily." *Dall v. St. Catherine of Siena Med. Ctr.*, --- F. Supp. 2d ---, 2013 WL 4432354, at *8 (E.D.N.Y. Aug. 14, 2013) (quoting *Anderson v. Rochester City Sch. Dist.*, 481 F. App'x 628, 632 (2d Cir. 2012)). "To find that an employee's resignation amounted to a constructive discharge, 'the trier of fact must be satisfied that the . . . working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 73 (2d Cir. 2000) (quoting *Lopez v. S.B. Thomas*, 831 F.2d 1184, 1188 (2d Cir. 1987)); *see Petrosino v. Bell Atl.*, 385 F. 3d 210, 229–30 (2d Cir. 2004) (requiring plaintiff to present evidence from which reasonable inference might be drawn that (1) employer's actions were "deliberate and not merely negligent or ineffective," and (2) a reasonable person in employee's position would find working conditions objectively intolerable).

Plaintiff focuses on the alleged constructive discharge, which he alleges was caused by the unsatisfactory performance reviews from 2006–2008, and the PAM and TIP, which resulted in 26 obtrusive classroom observations during the 2007–2008 academic year. (*See* Opp., at 18.) The question, therefore, is whether these working conditions—the increased classroom observations and performance scrutiny—collectively were so "objectively

---

[6] Because speech as an employee is not protected, the Court need not determine whether the speech involved a matter of public concern or conduct the *Pickering* balancing analysis. *See, e.g.*, *Jackler*, 658 F.3d at 227 ("If the employee did not speak as a citizen, the speech is not protected by the First Amendment, and no *Pickering* balancing analysis is required.").

11

intolerable" that a reasonable person in plaintiff's shoes would have felt compelled to resign.[7] *Petrosino*, 385 F.3d at 229–30.

The Court determines that no reasonable factfinder could conclude that this is so under the circumstances of this particular case.

In articulating the high threshold for demonstrating a constructive discharge, the Second Circuit has explained:

> A constructive discharge generally cannot be established . . . simply through evidence that an employee was dissatisfied with the nature of his assignments. . . . Nor is it sufficient that the employee feels that the quality of his work has been unfairly criticized. . . . Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant.

*Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993) (citations omitted); *see also Bennett v. Watson Wyatt & Co.*, 136 F. Supp. 2d 236, 251 (S.D.N.Y. 2001) ("Thus, excessive scrutiny of job performance does not make out a claim for constructive discharge. . . . Nor does [d]isagreement with management over the quality of one's evaluation is accompanied by other adverse consequences."); *accord Workneh v. Pall Corp.*, 897 F. Supp. 2d 121, 134–35 (E.D.N.Y. 2012). The Second Circuit has made clear that the *White* standard applies in First Amendment retaliation cases for determining whether an adverse action has taken place. *See Zelnik*, 464 F.3d at 227 ("Our standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in *Burlington Northern*."). Here, the Court similarly concludes that the alleged scrutiny and negative evaluations are not adverse actions for purposes of a retaliation claim, because plaintiff has not pointed to any adverse consequences that flowed from that conduct. Finally, to the extent plaintiff might claim a retaliatory hostile work environment, no rational jury could conclude that the alleged conduct reached an intolerable "critical mass." *Phillips*, 278 F.3d at 109.

---

[7] Plaintiff does not argue that the scrutiny and negative evaluations alone constitute adverse employment actions, but rather emphasized in his opposition that he was asserting a constructive discharge claim. (*See* Pl.'s Opp. Mem. at 1 ("[T]**his case concerns one adverse employment action which Defendants have glaringly failed to address in their papers: constructive discharge** . . . ." (bold in original)); *id*. at 12 (in response to arguments that excessive scrutiny and negative performance reviews do not qualify as adverse actions for a retaliation claim, stating: "On this aspect of Plaintiff's First Amendment claim, (as well as on this same aspect of his ADA and HRL claims), Defendants have, respectfully missed the boat. Paragraph 37 of the Complaint specifically pleads that plaintiff was constructively discharged from his tenured teaching position. As set forth below, this is the adverse employment action which is at the center of this case.").) In any event, even if such an argument were made here, the Court would conclude, under the facts of this case, that the scrutiny and negative evaluations were not adverse actions for purposes of a retaliation claim. Numerous courts have held that, even under the liberal standard for adverse employment actions in the context of retaliation claims, *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006), excessive scrutiny and negative performance reviews do not constitute an adverse action unless accompanied by some other adverse consequence. *See, e.g.*, *Anand v. N.Y. State Dep't of Taxation of Fin.*, No. 10-CV-5142, 2013 WL 3874425, at *9 (E.D.N.Y. July 25, 2013) ("[C]ourts have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse actions in a Title VII retaliation context." (quotations and citations omitted)); *Deshpande v. Medisys Health Network*, No. 07-CV-375, 2010 WL 1539745, at *14 (E.D.N.Y. Apr. 16, 2010) ("Likewise, the monitoring condition did not constitute a materially adverse action as defined under *White* [for retaliation claims]. . . . [E]ven under *White*'s more lenient standard, close monitoring, without more, is insufficient to constitute a materially adverse action under Title VII." (citations omitted)); *Ragin v. E. Ramapo Cent. Sch. Dist.*, No. 05 Civ. 6496 (PGG), 2010 WL 1326779, at *17 (S.D.N.Y. Mar. 31, 2010) ("In the retaliation context, it is clear from post-*White* decisions in this Circuit that a negative or critical evaluation will not constitute an adverse employment action unless the

performance. . . . Lastly, denials of promotions and raises, criticism of a plaintiff's work performance, and alterations in, or an employee's dissatisfaction with, [his] responsibilities or assignments do not give rise to an inference of constructive discharge." (quotations and citations omitted)); *Regis v. Metro. Jewish Geriatric Ctr.*, No. 97-CV-0906 ILG, 2000 WL 264336, at *12 (E.D.N.Y. Jan. 11, 2000) ("Indeed, as a matter of law, [plaintiff's] complaint of receiving closer scrutiny of her job performance by [the supervisor] does not make out a claim for constructive discharge.").[8]

Here, even construing the facts most favorably to plaintiff, no rational jury could find that plaintiff was constructively discharged. The Court does not discount that the increased scrutiny and negative performance reviews may have troubled O'Connor, and that the PAM and TIP required him to, *inter alia*, submit lesson plans on a regular basis and have more frequent classroom observations. (*See, e.g.*, PAM; TIP.) No reasonable factfinder, however, could conclude that these incidents led to material adverse consequences, or created working conditions that were so intolerable a reasonable person in plaintiff's shoes would have felt compelled to resign. Although the APPRs written by Leavy were more negative than previous ones, and the PAM and TIP required plaintiff to submit lesson plans in advance and provided for extensive classroom observations and other remedial measures, plaintiff proffers no evidence that his classes, hours, or responsibilities were materially restricted (if at all). He does not claim he was threatened with pay reduction, demotion, or termination if his performance did not improve. Giani even assured plaintiff that he was not in danger of termination. (*E.g.*, Def. 56.1 ¶ 195.) Further, plaintiff does not dispute that he was given opportunities to address the concerns raised by the observations (*id.* ¶ 31); offered a transfer to the high school in 2007, which he declined (*id.* ¶¶ 37–38); that evaluations by Amato were constructive (*id.* ¶ 82); and that Leavy gave positive evaluations as well (*id.* ¶ 221).

In short, plaintiff fails to show a genuine dispute as to whether the increased scrutiny and negative reviews, viewed collectively, created "working conditions [that were] so difficult or unpleasant that a reasonable person in [plaintiff's] shoes would have felt compelled to resign."[9] *Whidbee*, 223 F.3d

---

[8] In fact, even where a constructive discharge is not being alleged but rather plaintiff is simply trying to use increased scrutiny or negative reviews to show a lesser adverse employment action under Title VII, courts have found such conduct to be insufficient to even constitute an adverse employment action. *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 568 (6th Cir. Aug. 1, 2012) ("[Plaintiff] argues that he suffered an adverse employment action when department chair Joe Phelps engaged in 'frequent and unnecessary classroom observations' of [plaintiff's] class. . . . A brief, informal classroom observation by one entitled to observe, that results in no adverse consequences or penalties, is hardly an adverse employment action."); *Sotomayor v. City of New York*, 862 F. Supp. 2d 226 (E.D.N.Y. 2012) (in case involving a claim of unfair classroom observations, concluding that "[c]riticism of an employee in the course of evaluating and correcting her work is not an adverse employment action. . . . Nor do more frequent performance evaluations qualify as an adverse action.") (collecting cases).

[9] Although plaintiff attempts to rely on the administrative law judge's finding that plaintiff had good cause to resign, that finding is not dispositive on the constructive discharge claim in this case and, in any event, carries little weight because of the differing standard under which it was decided. First, the ALJ did not apply a "reasonable person" standard to determine whether the working conditions were objectively intolerable. (*See* Decision, Gould Aff. Ex. 1, at 3 (focusing on depression and stating that "good cause to quit cannot always be viewed from the perspective of the average reasonable man, but rather

at 73. Accordingly, in the alternative, the Court grants summary judgment to defendants on the First Amendment retaliation claim on this ground.[10]

### 3. *Monell* Liability

Because Leavy and Amato did not violate plaintiff's First Amendment rights as a matter of law, the District cannot be municipally liable based on any policy, practice, or custom, or the involvement of supervisory officials. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); *see also Pooler v. Hempstead Police Dep't*, 897 F. Supp. 2d 12, 20–21 (E.D.N.Y. 2012) (noting that *Monell* requires some constitutional violation). Accordingly, because there is no underlying tort, the Court grants summary judgment to the District on the First Amendment retaliation claim.[11]

### B. ADA Discrimination Claim

Defendants move for summary judgment on plaintiff's ADA discrimination claim, arguing that he cannot show (1) he was perceived as suffering from a disability that substantially limited a major life activity; (2) he suffered an adverse employment action; and (3) the District lacked non-discriminatory, non-pretextual reasons for the employment actions. Plaintiff, who now only argues that Leavy and Amato "regarded" him as having an ADA disability that rendered him unable to work[12] (Opp., at 1, 21, 23), counters that a reasonable jury could find in his favor because (1) he was being treated for dysthymia and anxiety from 2003 through his alleged constructive discharge in 2008 and (2) the heightened scrutiny began only after he told Leavy and Amato that he suffered from anxiety and depression (*id.* at 21–23). As set forth below, after viewing the facts and drawing all inferences in the light most favorable to O'Connor, the Court concludes that he has not established a prima facie ADA disability discrimination claim as a matter of law. First, there is simply no evidence from which a rational jury could find that plaintiff's supervisors regarded him as having an ADA disability. Second, in the alternative, no reasonable factfinder could conclude that the increased performance scrutiny is an adverse employment action. Accordingly, the Court grants summary judgment to defendants on the ADA disability discrimination claim.

### 1. "Regarded As" Having a Disability

The ADA prohibits discrimination against a "qualified individual on the basis of disability." 42 U.S.C. § 12112(a).[13] To

---

the perspective of the each [sic] individual claimant must be taken into account"). Second, the ALJ took into account plaintiff's anxiety and depression in finding that he could not handle the increased observations, but did not conclude that the defendants deliberately created an intolerable working environment in retaliation for his speech.

[10] Defendants also argue: (1) there is no causal relationship between plaintiff's speech and any subsequent adverse employment action; and (2) Leavy and Amato are entitled to qualified immunity. Because the Court has ruled that plaintiff's speech was not constitutionally protected and (in the alternative) plaintiff did not suffer an adverse employment action for purposes of a First Amendment retaliation claim, the Court need not address these issues.

[11] The Court, therefore, need not and does not address whether there was any official policy or custom, the effect of Leavy's and Amato's supervisory roles, or the cat's paw theory of liability.

[12] Plaintiff disclaims any hostile work environment or ADA retaliation claim. (Opp., at 1–2.)

[13] The ADA Amendments Act of 2008 ("ADAAA") became effective on January 1, 2009, and expanded the class of individuals entitled to protection under

succeed on an ADA claim, a plaintiff must prove "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of his disability or perceived disability." *Kinneary v. City of New York*, 601 F.3d 151, 155–56 (2d Cir. 2010) (quoting *Capobianco*, 422 F.3d at 56).

Here, plaintiff must show he was "regarded as having" a "disability" within the meaning of the ADA: "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. §§ 12102(2)(A), (C).[14] "[T]he decisive issue is the employer's perception of his or her employee's alleged impairment." *Giordano v. City of New York*, 274 F.3d 740, 748 (2d Cir. 2001). A plaintiff "is regarded as having an impairment" if he:

> (1) has a physical or mental impairment that does not substantially limit major life activities but is treated by an employer as constituting such a limitation; (2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; (3) or has none of the impairments defined in (b) of this section but is treated by an employer as having such an impairment.

29 C.F.R. § 1613.702(e); *see McCowan v. HSBC Bank USA, N.A.*, 689 F. Supp. 2d 390, 402 (E.D.N.Y. 2010).

Depression may qualify as a disability for purposes of the ADA, "provided that the condition is not a 'temporary psychological impairment,'" *Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 539 (S.D.N.Y. 2009) (quoting *Oblas v. Am. Home Assur. Co.*, No. 98-9350, 1999 WL 759026, at *2 (2d Cir. 1999)), and it substantially limits a major life activity, *see Mabry v. Neighborhood Defender Serv.*, 769 F. Supp. 2d 381, 399–400 (S.D.N.Y. 2011). An impairment "substantially limits" the major life activity of working if an individual is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3). "The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id.* The plaintiff "bears the burden of demonstrating that her employer 'perceived her to be incapable of working in a broad range of jobs' suitable for one of similar age, experience, and training." *Johnson v. City of New York*, 326 F. Supp. 2d 364, 369–70 (E.D.N.Y. 2004) (quoting *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 872 (2d Cir. 1998)).

It is undisputed that Dr. Wheeler diagnosed plaintiff with dysthymia and anxiety in 2003, and O'Connor was being

---

the ADA. This Court has indicated—and the parties agree—that the ADAAA does not apply to conduct that occurred prior to the effective date of the statute. *See, e.g.*, *Casseus v. Verizon N.Y., Inc.*, 722 F. Supp. 2d 326, 345 n. 14 (E.D.N.Y. 2010) (citing cases). Thus, the Court evaluates the evidence within the legal framework in place at the time of plaintiff's resignation in 2008 and not under the ADAA.

[14] Under the ADAAA, "disability" is now defined at 42 U.S.C. § 12102(1).

treated for those issues when he resigned in August 2008. (Pl. 56.1 ¶¶ 3, 266–67.) Leavy and Amato learned that plaintiff was depressed and anxious in 2006, and that he was seeing a counselor in 2007. (Def. 56.1 ¶¶ 130, 132, 135, 138.) However, the Second Circuit has made clear that knowledge of an impairment by an employer is, by itself, insufficient to show that an employer regarded an employee as a "qualified individual with a disability" under the ADA. For example, in *Reeves v. Johnson Controls World Services, Inc.*, 140 F.3d 144 (2d Cir. 1998), the Second Circuit explained:

> Defendants do not dispute that Johnson Controls knew of plaintiff's diagnosed mental impairment before he was dismissed. However, the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action. . . . Plaintiff must show that defendants perceived his impairment as substantially limiting in the exercise of a major life activity. Plaintiff does not specify which major life activity defendants allegedly perceived as substantially limited by his mental impairment. We reject the possibility that defendants perceived plaintiff as substantially limited in his ability to engage in "everyday mobility" not only because we conclude that, as defined by plaintiff in this case, "everyday mobility" is not a major life activity, . . . but because plaintiff presents no evidence tending to show that defendants perceived it as such.

*Id.* at 153; *see also Taylor v. Rite Aid Corp.*, Civil No. WDQ-12-2858, 2014 WL 320214, at *8 (D. Md. Jan. 27, 2014) (employer's "'awareness' that [plaintiff] had lupus and took intermittent FMLA leave, and that those conditions affected some aspects of her work, is insufficient to show [plaintiff] was regarded as disabled); *Green v. Pace Suburban Bus*, No. 02 C 3031, 2004 WL 1574246, at *8 (N.D. Ill. July 12, 2004) ("[T]o the extent that Plaintiff can show that the decisionmakers had at least potential exposure to the specifics of the medical diagnoses . . . Plaintiff identifies no evidence whatsoever that this exposure to any medical terms led to decisionmakers to come to any assessments concerning whether Plaintiff was disabled as to any of the major life activities that Plaintiff proposes. Precedent teaches that even if [the defendant] was aware of [plaintiff's] IDC [*i.e.*, heart condition] or any related condition such as dyspnea, mere awareness of a potential medical condition does not, standing alone, support an inference that [the defendant] regarded [plaintiff] as substantially limited in any of his proposed major life activities.") (citations omitted); *accord Helfrich v. Lehigh Valley Hosp.*, No. Civ. A. 03-CV-05793, 2005 WL 670299, at *18 (E.D. Pa. Mar. 18, 2005).

Here, plaintiff points to no evidence, beyond the supervisor's mere awareness of his treatment for depression, that they regarded him as disabled. In fact, the uncontroverted evidence in the record belies any conclusion or reasonable inference that defendants perceived him as disabled. First, plaintiff never provided the District with any doctor's recommendations. (Def. 56.1 ¶¶ 128–29.) Second, neither Leavy nor Amato knew plaintiff's depression was clinical or required any accommodations. (*See, e.g.*, Def. 56.1 ¶¶ 133–35, 139.) They thought his depression was due to conflicts

in the workplace. (*E.g.*, *id.* ¶ 136.) Third, no APPR or other written document references anxiety and depression. (*See, e.g.*, 2002–2008 APPRs, Gould Aff. Exs. 6–10, 12, 26.) Fourth, even when he increased his scrutiny of plaintiff, Leavy never restricted plaintiff's hours and teaching time, reached any conclusions regarding plaintiff's performance because of any perceived disability, or made any remarks suggesting that plaintiff could not perform his professional duties because of depression and anxiety. Finally, the fact that plaintiff was scheduled to teach from 2008–2009 also belies any conclusion that defendants perceived him to be unable to work as a teacher or any "broad range of jobs," 29 C.F.R. § 1630.2(j)(3). *See, e.g.*, *Taylor*, 2014 WL 320214, at *8 (by offering a different position, employer "specifically demonstrated its perception that Plaintiff could continue to work" and thus did not regard [plaintiff] as disabled (internal quotations and citations omitted)).

By way of contrast, in *McCowan*, this Court found that the plaintiff had set forth sufficient evidence to create a triable issue of fact regarding whether the defendant regarded the plaintiff as disabled, because there was evidence that (1) the supervisor made remarks in front of plaintiff about depression and depressed individuals; (2) the supervisor restricted the plaintiff to entry-level tasks and made statements regarding her inability to resume her role at work after returning from disability leave; and (3) the supervisor regarded the plaintiff as unable to perform her job. 689 F. Supp. 2d at 403. Here, other than plaintiff's subjective perceptions, there is no evidence from which a reasonable factfinder could conclude that Leavy and Amato considered plaintiff to be substantially limited in a major life activity.

Courts have reached a similar conclusion under analogous circumstances. For example, in *Adams v. Festival Fun Park, LLC*, Civil Action No. 3:11-cv-427 (JCH), 2013 WL 951710, at *6–7 (D. Conn. March 12, 2013), the court granted summary judgment for an employer on a "regarded as" claim and concluded that, although supervisors were aware of mental impairment, no rational jury could find he was "regarded as" disabled:

> Adams has not provided evidence from which a reasonable jury could find that Festival Fun Parks regarded him as disabled within the meaning of the ADA. Adams did not testify that he told his supervisors that he had taken special education classes and that he had a "hard time with remembering a lot of things. . . ." However, even viewing this evidence in a light most favorable to Adams, it does not show that his supervisors' awareness of his comments resulted in their perceiving him as being disabled, much less substantially limited in his exercise of a major life activity. Adams did not show them any medical reports assessing him as mentally disabled, and there is no evidence that his soon-to-be supervisors responded to Adams' comments in a way that evinced that they perceived him to be disabled. In fact, after this conversation occurred, Festival Fun Parks hired him as a full-time employee, and nothing in the record shows any reservations related to this decision.

*Id.* at *6 (citation omitted); *see also Ogborn v. United Food & Commercial Workers Union, Local No. 881*, 305 F.3d 763, 768 (7th Cir. 2002) (granting summary judgment

for union employer and concluding that, although plaintiff asserted that he was "regarded as" disabled due to his depression, plaintiff "has not presented evidence that union personnel held exaggerated views about the seriousness of his illness"); *Zuppardo v. Suffolk Cnty. Vanderbilt Museum*, 19 F. Supp. 2d 52, 57 (E.D.N.Y. 1998) ("[E]ven assuming that the plaintiff was able to establish that the Museum viewed Zuppardo as suffering from a mental impairment, there has been no suggestion that the Museum perceived such impairment as interfering with his ability to perform his essential job functions.").

Accordingly, the Court grants summary judgment to defendants on the ADA discrimination claim on this ground.

2. Adverse Employment Action

The Court further concludes, in the alternative, that summary judgment is warranted because plaintiff cannot show an adverse employment action because of his disability. An adverse employment action is a "materially adverse change" in the terms and conditions of employment. *Sanders*, 361 F.3d at 755 (citing *Richardson v. N.Y.S. Dep't of Corr. Serv.*, 108 F.3d 426, 446 (2d Cir. 1999)). As extensively detailed *supra*, plaintiff fails to establish that he suffered a constructive discharge. Accordingly, the Court grants summary judgment to defendants on the ADA discrimination claim on this ground as well.[15]

C. HRL Discrimination Claim

Plaintiff's complaint also asserts a cause of action under New York law.

Having determined that the federal claims against the County do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc.*, No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claim because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Liz Claiborne, Inc.*, No. 99 Civ. 3608, 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by

---

[15] The Court, therefore, does not address whether plaintiff otherwise was qualified to perform the functions of his job or whether defendants had legitimate non-discriminatory reasons for the additional performance scrutiny.

refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claim given the absence of any federal claims that survive summary judgment.

## IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety with respect to the federal claims. The Court declines to exercise supplemental jurisdiction over the state law claim and, thus, dismisses such claim without prejudice. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 25, 2014
      Central Islip, NY

\* \* \*

Plaintiff is represented by Jane Bilus Gould of Gould & Berg, LLP, 222 Bloomingdale Road, Suite 304, White Plains, NY 10605-1513. Defendants are represented by Jeltje DeJong, Anne C. Leahey, Joshua Shteierman, and Kelley E. Wright of Devitt Spellman Barrett, LLP, 50 Route 111, Smithtown, NY 11787.